Nos. 754-975

First Circuit

———

SHERIDAN v. THIBODAUX BENEVO-
LENT ASSN.

———

(May 5, 1931. Opinion and Decree.)
(October 7, 1931. Rehearing Granted.)
(May 2, 1932. Opinion and Decree on Re-
hearing.)
(May 23, 1932. Writs of Certiorari and
Review Refused by Supreme Court.)

———

Ott & Rich, of Bogalusa, attorneys for plaintiff, appellee.

Voorhies & Labbe, of Lafayette, and Ott & Johnson, of Franklinton, attorneys for defendant, appellant.

ELLIOTT, J. Mrs. Cora E. Sheridan claims $1,000 of the Thibodaux Benevolent Association as due her on a benefit certificate, and the further sum of $50 on a burial fund certificate for that amount. These certificates had been issued to George C. Sheridan, her husband, as a member of the said association. Mrs. Sheridan is the beneficiary in the certificate for

$1,000, and the certificate for $50 was payable to her as beneficiary of her husband. She alleges that George C. Sheridan was a member of said association in good standing at the time of his death; that said association has refused to pay said certificate after due proof of his death and amicable demand.

She brought suit in Washington parish, the parish in which she resides and of which her husband was a resident at the time of his death.

The defendant, Thibodaux Benevolent Association, is domiciled in the parish of Lafayette.

Defendant excepted to the jurisdiction of the Washington parish court ratione personae. This exception was overruled, and an exception of non-joinder was then filed, which was also overruled.

Defendant then answered, denying plaintiff's right to recover on the certificates, and alleges that it is not liable at all, but that, if liability exists, it is that of the membership of the association, and that they can only be called on to pay in conformity with the articles of agreement under which the association exists.

The association further alleges that the membersip of George C. Sheridan was based on certain warranties concerning his health contained in his application for membership, in which he agreed that, if the stipulation concerning his health were not true, his membership in the association was to be null and void; that said Sheridan, after becoming a member, permitted his membership to lapse on account of nonpayment of assessments; that he afterwards made application for reinstatement, making certain statements in his application as to his health, agreeing therein that if his statements were untrue, his reinstatement was to be null and void.

Defendant alleges that the statements of said Sheridan in regard to his health in his application for membership and in his application for reinstatement were false and untrue; that his membership and said certificates were therefore null and void. Defendant tendered to plaintiff the premium which George C. Sheridan had paid, with accrued cost at the time of answering, and prayed that plaintiff's demand be rejected. There was judgment in favor of the plaintiff as prayed for. Defendant has appealed.

The Code of Practice, art. 165 (amended by Act No. 130 of 1926), in providing exceptions to the general rule, which requires a defendant to be sued before the court having jurisdiction over the place of his domicile or residence, says:

"10. In all suits on a policy of * * * life, * * * or sick benefit insurance * * * in case of life insurance, at the domicile of the deceased or his beneficiary."

Defendant contends that it is a beneficent or benevolent association and not an insurance company, and that it is not liable to the provisions of this article of the Code of Practice, and can only be sued in the parish of Lafayette.

The question of jurisdiction was submitted to the court on an agreed statement of facts.

The articles of agreement whereby the Thibodaux Benevolent Association exists, offered in evidence, declare that Thibodaux Benevolent Association Circle 3 is a copartnership.

The Civil Code, book 3, title 11 (articles

2801-2890), contains the law on the subject of partnership. It is stated in the articles of agreement that it is to have duration for 99 years, and makes no provision on the subject of profits and loss. On the *death of a member, the association* is to continue with new members for the period of time stated. The purpose of the association is, not to form a partnership, but to provide a fund, upon the death of a member to be collected from the membership for the benefit of the beneficiary of the member deceased.

The testimony of the president, Dudley J. LeBlanc, taken by commission, in answer to interrogatory 31, shows, in connection with the article of agreement, that the association is a form of life insurance.

We copy from Vance on Insurance (Hornbook Series) sec. 30, p. 58 et seq., as follows:

"**Life Insurance by Mutual Benefit and Adjustment Associations.**—The fact that the various benefit associations include insurance upon the lives of their members as only one of the many functions undertaken by them, has induced many authorities to make statements implying that insurance by such associations is peculiar and not subject to the rules of law applying to the ordinary contract of life insurance. This, however, is not correct. For whatever may be the ultimate motive of the members of such benefit associations and however true that their membership may be based on the fraternal desire of mutual aid and for the promotion of social pleasures, yet the right of members to demand the benefits due in case of sickness or death, in accordance with the terms of the membership certificate, is purely a contract right, and none the less subject to the rules of law applying to life insurance, because of its intimate connection with the other benevolent purposes of the association.—It may therefore be properly said that so far as the contract of membership in such benefit associations provides for the contingent payment of money in case of sickness or death, the agreement is one purely of life insurance, and in no wise different from the contract of similar effect made by the so-called 'Old Line' companies."

The distinction between a membership certificate in a benefit association and the contract in an old line policy is then taken up by the author, but the distinction leaves unaltered the paramount fact that a benefit or benevolent association is a form of life insurance.

Bacon on Benefit Societies & Life Insurance (3rd Ed.) vol. 1, sec. 50 et seq., p. 81 et seq., and Ruling Case Law, vol. 19, subject, Mutual Benefit Societies, sec. 7, p. 1185, are to the same effect. The question of jurisdiction is considered in section 106, p. 1318.

The Code of Practice takes no account of the different forms of life insurance in providing where they may be sued. The exception to the jurisdiction of the court was, in our opinion, properly overruled.

The plaintiff sued the defendant by the name given in the articles of association, citing it through its president, Dudley J. LeBlanc.

The defendant excepted, urging "that the Thibodaux Benevolent Association is an unincorporated association of persons, and plaintiff's petition fails to make the members thereof parties defendant." This exception was submitted to the court on an agreed statement of facts contained in the record.

Defendant cites Civil Code, art. 446, and Workingmen's Accommodation Bank v Converse, 29 La. Ann. 369, and other au-

thorities, to which we add Soller v. Mouton, 3 La. Ann. 541.

The article of the Civil Code has reference to corporations unauthorized by law. This defendant is an unincorporated organization authorized by law. Article I of the articles of agreement declares: "This co-partnership shall be known as the Thibodaux Benevolent Association, Circle 3 * * * by which name it shall do business, sue and be sued." This agreement is binding on defendant. The articles of the association provide that it must have a membership of 2,000. It is not possible to cite 2,000 defendants in this suit.

The language contained in the United Mine Workers v. Coronado, 259 U. S. 344, 42 S. Ct. 570, 66 L. Ed. 975, 27 A. L. R. 762, is a proper authority in favor of the suit as brought.

In Executive Committee v. Tarrant, 164 La. 83, 113 So. 774, 776, 53 A. L. R. 1233, the Supreme Court, referring to the members of an unincorporated association, said:

"Where the members have a common or general interest in the subject-matter of the suit, or where the members are numerous and it is impracticable to bring them all before the court, since those who sue may fairly be presumed to represent the rights and interest of the whole," sustained the competency of certain plaintiffs to bring a suit in which many others were interested.

The converse of this proposition is equally true when the members of an unincorporated association are too numerous to be all sued. The doctrine of virtual representation of all the defendants applies in a case like the present. Ruling Case Law, vol. 20, subject, Parties, sec. 11, p. 672.

The present suit comes within the express provision of Act No. 170 of 1918. The case of Soller v. Mouton, 3 La. Ann. 541, and Workmen's Accomodation Bank v. Converse, 29 La. Ann. 369, must yield to this enactment and to the necessity of the situation.

The exception of non-joinder was properly overruled.

The plaintiff offered her evidence.

The defendant then offered evidence, the object and purpose of which was to support the defense that George C. Sheridan had knowingly and untruthfully answered questions concerning the state of his health at the time of applying for membership, and had subsequently knowingly made an untruthful statement concerning his health in his application for reinstatement; that his answers in each instance deceived the defendant into accepting him as a member; that his membership, based on his answers, if recognized, would operate as a fraud on defendant; that his membership in the beginning, as well as that under his reinstatement, together with the certificates sued on, were, for said reasons, null and void, and without force or effect.

The plaintiff objected to testimony having this purpose in view, stating her objections at length to that of A. B. Westerfield, Dr. Martin, Dr. Lafferty and Dr. Bacot, offered by the defendant. The court overruled the objections only to the extent that it permitted the testimony offered to be introduced, to the end that it might be in the record in case of an appeal, and was ruled admissible on appeal. The lower court felt that the objections were good, and that the evidence was not admissible, because it could not have rendered judgment for the plaintiff as prayed for if the evidence had been taken into account.

It will serve no purpose, however, for us

to act on these objections in connection with the membership of George C. Sheridan based on his first application, bearing date September 1, 1927, because the preponderance of the evidence on the subject does not show that his answers were untruthful in applying for his first membership.

The record shows that Sheridan, before becoming a member of the defendant association, obtained a benefit paying policy in the Pan-American Life Insurance Company. He found it well, after becoming a member of the defendant association, to avail himself of the benefits due under his policy in the Pan-American Life Insurance Company.

Dr. E. E. Lafferty, who was engaged in treating Sheridan for his sickness, made a report to that company on July 5, 1928, in connection with his application for benefits under that policy, stating that Sheridan had chronic nephritis, hypertension.

"Q. On what day did disability occur?
"A. January 1, 1928 (claimant's statement).
"Q. On what day were you first consulted by claimant in connection with the present disability?
"A. About May, 1927."

If this date, May, 1927, was true, it would make Sheridan's consultation with Dr. Lafferty concerning the disease of which he died, say, four months previous to the day of his application for membership in the defendant association.

Dr. P. R. Bacot, who also made an ex parte report to Pan-American Life Insurance Company concerning Sheridan's sickness, stated in his report:

"Q. On what day did disability occur?
"A. October 15, 1927.
"Q. On what day were you first consulted by claimant in connection with the present disability?
"A. October 15, 1927."

This was a month and a half subsequent to Sheridan's application for membership in the defendant association, and a month and six days subsequent to the day of the certificates sued on by the plaintiff.

The report of Dr. Lafferty and that of Dr. Bacot to the Pan-American Life Insurance Company was placed before the court in the testimony of Mr. Westerfield, an officer of that company. Dr. Lafferty, as a witness on the trial of the present suit, does not sustain his report to Pan-American Life Insurance Company that he was first consulted by Sheridan in connection with the disability of which he died in May, 1927. His testimony leaves the date indefinite:

"Q. Did you treat Sheridan for the disease with which he died?
"A. Yes, sir.
"Q. When was your first treatment of that particular disease?
"A. I do not remember the exact date; I treated him before Dr. Martin and also after he treated him, and I saw him a few times while Dr. Martin was treating him.
"Q. What was that disease?
"A. Chronic Bright's disease and high blood pressure.
"Q. Can you tell us rather definitely when the first visit was that he called at your office?
"A. No, sir, I can not.
"Q. Dr. Martin stated that he treated him the first time on May 17th, 1928, was it before that time?
"A. I treated him before Dr. Martin treated him and also afterwards, and I saw him a few times while Dr. Martin was treating him."

Dr. Lafferty never became more definite on the trial as to the time Sheridan first consulted him with reference to the disease of which he died than to say that he treated him before Dr. Martin treated him.

Dr. Martin testified that he was first consulted by Sheridan, and found him with

what might be said to have been the disease of which he died, on May 17, 1928, which was more than four months after the day he first applied for membership in the defendant association.

H. N. Simmons, who took Sheridan's application for membership, found him at work in his field gathering corn. He was Sheridan's neighbor, and knew him well.

"Q. What was his appearance, he appeared to be in good health?
"A. Yes, sir. He was in good health as far as I could see.
"Q. You knew him personally and you went around and solicited his membership?
"A. Yes, sir. That was my business, soliciting for the Thibodaux Benevolent Association."

Sheridan's answers were written down by this witness as given him by Sheridan, and he was recommended by this witness to the defendant association for membership with the answers given.

In his application for membership, Sheridan answered "No" to all questions asked him about diseases. On answer to a specific question about kindney trouble, he answered "No."

It has been decided a number of times that a policy of life insurance is not to be set aside on the ground that the applicant untruthfully answered questions concerning his health, even though it turned out afterwards that applicant, unknowing to himself, was infected at the time with a disease which in the end terminated his life. Cole v. Life Ins. Co., 129 La. 704, 56 So. 645, Ann. Cas. 1913B, 748; Goff v. Mutual Life Ins. Co., 131 La. 98, 59 So. 28; Valesi v. Mutual Life Ins. Co., 151 La. 405, 91 So. 818; Cunningham v. Penn Mutual Life Ins. Co., 152 La. 1023, 95 So. 110; Carroll v. Mutual Life Ins. Co., 168 La. 953, 123 So. 638.

The preponderance of the evidence does not show that Sheridan was suffering with Bright's disease on September 1, 1927, the day of his application for membership, nor on September 6, 1927, the day the certificates sued on were issued.

The defense in that respect is not sustained.

The record shows that Sheridan, after becoming a member, failed to keep up his membership by paying assessment dues.

Article 6 of the agreement under which the defendant was formed contains the provision:

"It being understood that such member shall cease to be a member and shall forfeit his rights to any benefit to his or her certificate and to all funds or affairs of this co-partnership and without further notice, in the event they shall fail to pay such assessment dues within 20 days after they have been notified by the Association to pay the same. And the mailing of such notice shall be conclusive evidence that it has been received by the member. Such defaulting member, if not over age and in good health, may be re-instated in the discretion of the Board, upon the payment of all dues and assessments owed by him or her to this Association."

It has been held that an agreement of this kind in the by-laws of the American Legion of Honor was self-operative, and, upon failure of a member to pay dues, the member ceased to be a member. Feiber v. Supreme Council, 112 La. 961, 36 So. 818.

Delinquency on the part of Sheridan in the matter of his dues to the defendant is conclusively shown by his application for reinstatement. This application bears date October 22, 1928, and contains the following stipulation on the part of Sheridan:

"I * * * apply for re-instatement in the Thibodaux Benevolent Association and for

that purpose I hereby represent and warrant that I have no sickness or disease and have met with no accident leaving me in a diseased, disabled or crippled condition since my membership lapsed; that my general health is good."

Defendant avers that Sheridan was aware at the time the above statement was made that it was untrue. There can be no doubt about it, in view of the report of Dr. Lafferty and Dr. Martin to the Pan-American Life Insurance Company, their subsequent testimony given on the trial of the case, and the sworn statement to the Pan-American Life Insurance Company by Sheridan himself on July 19, 1928, in his application for benefit payments to that company.

Mr. Blackwell, who took Sheridan's application for reinstatement, testified on the subject as follows:

"Q. Do you recall having taken an application for the reinstatement of G. C. Sheridan?
"A. Yes, sir.
"Q. Where was that taken?
"A. Just inside the Great Southern pasture I met him one morning. I don't know where he was going, but I met him and asked him about it—to let me reinstate him. At that time it cost one dollar for reinstatement and I said you can go ahead and pay me later. He didn't have the money with him; so in about a week later or two weeks I met him in Bogalusa and he paid me the dollar. He told me that morning—he says, I'm sick today, and I says, well, if you die I'll make the company go out and get the $1,000, or something like that, just joshing.
"Q. Was G. C. Sheridan doing anything at that time, that you know of, any kind of work?
"A. I don't know. The morning I reinstated him he was in a hurry. He wanted to get back home to do something; seems to me like he said he wanted to dig potatoes. He was in a hurry, any way.
"Q. Who suggested his reinstatement, you or him?

"A. I did."

As against this testimony that Mr. Sheridan was up and about and not sick on October 22, 1926, we have his application to Pan-American Life Insurance Company for benefit payments under his policy in that company made July 19, 1928, more than a month previous. He was then asked:

"Q. Are you wholly, continuously and permanently disabled?
"A. Yes.
"Q. Will you be unable for the remainder of your life to perform any work or conduct any business for gain, compensation or profit?
"A. Yes.
"Q. When did you quit work entirely?
"A. January 1, 1928.
"Q. For what proportion of each day are you confined to your bed and to your house?
"A. All day, except calling on doctor."

Dr. Lafferty and Dr. Martin both testify that they had, at the time he applied for benefits to Pan-American Life Insurance Company, given him to understand the nature of the disease with which he had been taken.

His statement to the Thibodaux Benevolent Association in his application for reinstatement to membership that he was not diseased, and that his general health was good, was to his knowledge untrue, and untrue to the extent that it must have the effect of rendering his membership in that association, together with the certificates sued on, null and void, and of no force and effect, if it is admissible against the plaintiff. Goff v. Mutual Life, 131 La. 98, 59 So. 28; Lee v. N. Y. Life, 144 La. 445, 80 So. 652; Null v. Sovereign Camp, W. O. W., 2 La. App. 401; Vaughn v. Metropolitan Life, 3 La. App. 614. It is therefore necessary to act on plaintiff's objections in con-

nection with Sheridan's application to the defendant association for reinstatement.

Her objections, abbreviated as much as possible, without taking from their meaning and effect, may be stated as follows:

(1) That, under the provisions of Act No. 97 of 1908, where no medical examination was required before issuing insurance on the life of an insured, as in this case, the defendant waived any defense in regard to the health of the insured, which defense seeks to defeat the payment of the policy.

(2) That, under the provisions of Act No. 227 of 1916, no statement made by the insured can be used as a defense on a policy issued, unless such statement be contained in the application. In this case none was annexed to the policy or certificate.

(3) That under the provisions of Act No. 227 of 1916 neither the insured nor the beneficiary is bound by any by-law, constitution or regulation not attached to, or made part of, the certificate furnished to the insured and beneficiary.

(4) And for the further reason that the defense set up in the answer does not allege sufficient legal facts to support a defense to defeat recovery under the policy sued on in this case.

Sheridan's application for reinstatement contains the following stipulation:

"* * * In consideration of my reinstatement I hereby agree that my original application, my declaration thereon, my declaration hereon, my certificate, and by-laws of the Association, dated October 30th, 1925, shall in the event of my reinstatement, constitute the contract between myself and the Thibodaux Benevolent Association, and that if reinstated, my beneficiary or beneficiaries will not be entitled to any insurance caused by my death in the event it occurs before the day of my reinstatement; nor will they be entitled to any benefits if any misrepresentations have been made by me."

Plaintiff contends that Act No. 97 of 1908 governs this case, and that, even though fraud in answering questions may be charged and established, fraud is not an available defense under this act when a medical examination has not been required.

This act provides that:

"Whenever life, health or accident insurance companies, which issue policies or contracts of insurance to the assured without a medical examination of the assured by a physician, it shall be presumed (whenever it appears that the agent of the company has had an opportunity to ascertain the true condition of the health, habits or occupation of the assured, and has certified to the company the desirability of the risk), that the knowledge acquired, or which might have been acquired with reasonable diligence by the agent of the company in securing the application, as to the health, habits or occupation of the assured, has been disclosed to his principal; and it shall also be presumed that the company has waived its rights to claim a forfeiture of the policy based on the ground that the assured did not make true and full answers in the application as to the health, habits or occupation whenever it shall appear that the agent of the company knew, or might have ascertained with reasonable diligence, the true condition of the applicant's health, or the real facts as to his habits or occupation, knowledge of the agent of the company in writing the application, or of the collector of the company in collecting the premiums from the assured, shall be imputed as notice to the company, as to the health, habits or occupation of the assured."

This act seems to us, by its terms, to contemplate only insurance companies that issue policies to be paid by the insurance company after the death of the insured. Under defendant's organization, the certifi-

cates issued are paid after the death of a member, not by the association, but by means of assessments levied on the membership.

Furthermore, the insurance companies contemplated by this act have agents with authority from the company to sell insurance for profit on the part of the company. In the defendant association there is no profit to the association in issuing certificates to those who become members. Then again, the insurance companies contemplated by the act are such as have agents with authority from the company, upon selling insurance, to have the health of the person to whom the sale is made examined by a physician. The defendant association has no such agents, but, as testified to by Mr. LeBlanc, an examination by a physician of the health of an applicant may be ordered, if his answers indicate that it is advisable that it be done.

Article 10 of the articles under which the defendant association exists stipulates on this subject as follows:

"It is understood and agreed that these articles, as well as the application and beneficiary certificate, are parts of the contract or agreement between the association and the member. The application of a person is accepted by the association based upon the statement of facts contained in it, which are taken as true and correct, whether written by the person or not, and if any part of same is untrue, or if any misrepresentation has been made to gain admission into the association, or for any other purpose, the person agrees that his or her membership shall be null and void —in which case he or she shall not be entitled to any benefits of this association."

In the case of Russ v. Supreme Council of the Legion of Honor, 110 La. 588, 34 So. 697, 98 Am. St. Rep. 469, the Supreme Court held:

"A benefit certificate issued by a mutual aid association to one of its members is a contract, which can be changed only by the consent of both parties."

The case of Randazzo v. La. Mutual Aid Fire Indemnity Society, 13 Orleans App. 223, is to the same effect.

In the case of Mull v. Sovereign Camp, W. O. W., 2 La. App. 401, the court said (we quote from the syllabus):

"A false statement by an applicant for fraternal benefit insurance to the effect that he had not consulted a physician for five years and was 'never sick' voids the certificate of insurance subsequently issued by the fraternal benefit society when the application contains a clause stipulating that any false statement contained therein shall vitiate the insurance. Particularly is this true when the applicant is shown to have been suffering with tuberculosis at the time the application was executed."

According to Bacon on Benefit Societies and Life Insurance (3d Ed.) sec. 50, p. 81, and section 193, p. 399, the application of statutory provisions, such as Act No. 97 of 1908, to benevolent associations, depends on the evident intent of the act.

The same subject, application of statutes of the kind mentioned to benevolent associations, is considered in Vance on Insurance, sec. 30, p. 59 et seq., and Ruling Case Law, vol. 19, subject, Mutual Societies, sec. 7, p. 1185 et seq. We do not quote from these authors, because to get their views it is necessary to read the entire sections on the subject.

In the case of Massachusetts Protective Assn. v. Ferguson, 168 La. 271, 121 So. 863, it was held that, although fraud was charged in obtaining a policy, obtained without medical examination as provided for in this act, the charge did not render

the act any the less applicable. But in that case the policy seemed to be one of the standard forms of mutual life insurance; therefore, we think the case not governing in the present situation.

It is our conclusion that Act No. 97 of 1908 was not intended to, and therefore does not, apply to benevolent associations having only such purposes, objects and government as the defendant.

The plaintiff further cites and relies on Act No. 227 of 1916. This act refers to life insurance, and provides:

"That every policy of insurance issued * * * by any life insurance corporation doing business within the State shall contain the entire contract between the parties and nothing shall be incorporated therein by reference to any constitution, by-laws, rules, application or other writings unless the same are endorsed upon or attached to the policy when issued; and all statements purporting to be made by the insured shall in the absence of fraud be deemed representations and not warranties, and no statement or statements not endorsed upon or attached to the policy when issued shall be used in defense of a claim under the policy unless contained in a written application and unless a copy of such statement or statements be endorsed upon or attached to the policy when issued. Any waiver of the provisions of this section shall be void."

This act is expressly limited in its application to corporations. The defendant is not a corporation. Not only that, but the act provides an exception when there has been fraud in the representation. The Supreme Court, in considering this provision in the act, has held that the provisions of the act do not protect the insured if fraud has been practiced in answers of such character that the insurance companies were thereby deceived and would be defrauded if the contracts are enforced. This

was decided in Goff v. Mutual Life, etc., 131 La. 98, 59 So. 28; Lee v. New York Life, etc., 144 La. 445, 80 So. 652. The same is the proper inference from Valesi v. Mutual Life, etc., 151 La. 405, 91 So. 818, and Carroll v. Mutual Life, 168 La. 953, 123 So. 638.

This court in the case Jim Vaughn v. Metropolitan Ins. Co., 3 La. App. 614, acting on a defense of this kind in which this act was invoked, had this to say:

"We are satisfied from the facts and circumstances in the case that he [meaning the insured] must have been aware and was aware that he had tuberculosis at the time he applied for the insurance; therefore his answers amounted to a fraud on the defendant within the sense and meaning of the law."

In the case Lee v. New York Life, the insured, as in this case, had Bright's disease. As already stated, the act in question is limited to corporations, consequently it does not in terms apply to the defendant. But suppose it to be applicable, under the exception which it contains, when there has been fraud it does not govern the situation in the present case, because fraud is charged and proved in the matter of the reinstatement. Therefore the reinstatement as well as the certificates sued on must be regarded and held to be null and void.

Before concluding, we desire to say that Act No. 256 of 1912 (title Amended Act No. 287 of 1914), providing for the organization, admission and regulation of associations transacting the business of life, accident, benefit and physical disability insurance on the fraternal plan, section 4 of which provides: "That except as herein provided, such societies shall be governed by this Act, and shall be exempt from all provisions of the insurance laws of this State * * * and no law hereafter enacted

shall apply to them, unless they be expressly designated therein," provides for fraternal organizations having a lodge system and a ritualistic form of government. The act for said reasons does not apply to the defendant, which was not organized for fraternal purposes, has no lodge system, and is not governed in the way stated.

The judgment appealed from is in our opinion erroneous and contrary to the law and the evidence, and should be annulled and set aside and plaintiff's demand rejected.

For these reasons, the judgment appealed from herein is annulled, avoided, and set aside, and the demand of Mrs. Cora Sheridan, the plaintiff, is now refused and rejected at her cost in both courts.

---

### ON REHEARING

LeBLANC, J. The question about which we entertained further doubt, after the original decision of this case on appeal, 134 So. 360, was whether the provisions and waivers in Act No. 97 of 1908 applied to an association of the character of this defendant.

The original opinion of this court holds that the Act of 1908 referred to, as well as Act No. 227 of 1916, do not govern mutual benevolent associations, which is what this defendant was held to be, and therefore the waivers therein referred to do not apply, and, as the insured had misrepresented the condition of his health at the time of his application for reinstatement, the defendant was relieved from liability and the beneficiary was denied recovery under the certificate which she held.

We are still of the opinion that the statements made by the insured at the time he applied for reinstatement were untrue. We are also of the same opinion that the provisions of Act No. 227 of 1916 do not govern in this case, as they are to be applied only against those insurance companies which are legal corporations. In other words, such companies as are duly incorporated under the laws of those states in which they have their domicile. The defendant here is not an incorporated association, and therefore does not come within the requirements and provisions of that act.

The task of reviewing the case on this rehearing is therefore limited to a consideration of two questions: (1) Is the defendant such an insurance company as is governed by the provisions of Act No. 97 of 1908; and, if it be held to be such, (2) do the waivers provided for under that act apply only to statements made in connection with the original application for insurance, or do they apply equally to statements made in connection with an application for reinstatement of a lapsed policy or certificate?

There is no doubt but that several important differences can be pointed out between associations like this defendant and regular life insurance companies, but, when fully analyzed, is not the fundamental purpose of each the same? Are not such associations in substance and effect companies or associations carrying on the business of life insurance? Instead of a policy, the beneficiary holds a certificate, both being to the same effect, which is that, within a certain time, after proof of death of the insured, the company will pay to such beneficiary a certain sum of money, provided the insured (who is called a member in the association) shall have paid all dues assessed against him. This assessment corresponds to the premiums

paid by the insured in the regular insurance company, and, instead of having to be paid at stipulated periods, has to be paid upon due notice of the death of a member in the same circle to which he belongs. It is true, although the amount to be paid under the certificate is stipulated as being $1,000, that there is a qualifying provision following, which may limit it to a certain amount according to the collections that are made, but that qualification does not take away from the association its nature and character, which, strictly speaking, is a form of life insurance. Regular life insurance companies bind themselves to pay a certain amount specified in the policy which they issue, which amount is necessarily also based on the number of persons they keep insured and on a death rate that is calculated along the most scientific lines. If they did not maintain or increase the number of persons they insure, or, if, as LeBlanc, the president of the defendant association, says, they insured people, regardless of their health, they would not be able to survive and pay off their losses any more than his association could. Regardless of the altruistic motives which he says lie back of his association, it stands out in the final analysis as essentially a form of life insurance based on the plan of mutual life insurance. The lofty sentiments of friendship and family ties referred to by him and by which he says members are bound to each other to help themselves in the misfortune of death are overshadowed by a consideration of the fact that the association is statewide, or perhaps wider, and that in a single circle, such as the one to which the deceased in this case belonged, and which is circle No. 3, there are two thousand people, some living hundreds of miles apart, and a vast majority no doubt being total strangers to each other. Our conception of a truly mutual benefit society is better conveyed in paragraph 6, which deals with the subject in Ruling Case Law, volume 19, page 1183, than we can express it ourselves. In making a distinction between such societies and insurance companies, among other things, it is stated:

"Nor are benevolent and beneficial associations influenced solely by the strict letter of their contractual obligations, but also by a spirit of fraternity. Thus, it not infrequently happens that the dues of a sick member are paid by the members of his subordinate lodge, or put out of its treasury, to keep him in good standing, in the face of impending death, for the very purpose of securing the payment of the benefit fund to his family. Such is not the conduct of mere strangers with each other, or of those who are bound only by the ties of insurance."

We cannot say that we read in the organization of the Thibodaux Benevolent Association any such kind of society, and neither do we see, in the conduct of its business any such relation between those who compose it.

That there are differences between such associations as are referred to and regular life insurance companies, is, as already intimated, patent. But the question at issue is: Are they such differences as exempt them from the provisions of states' laws respecting insurance? In some jurisdictions, it is held that they are, but, as we view it, the weight of authority is otherwise. As appears from Ruling Case Law in the section following the one just quoted, in a number of jurisdictions, they are exempt by some express provisions of law from the regulations, or some of the regulations imposed on life insurance companies. "Under statutes of this nature," says that authority, "the decisions vary as to what is essential to bring an association

within the exception, but they are practically unanimous in agreeing that where such associations have an insurance department and the provisions of a fraternal character are eliminated, their primary and only purpose is that of life insurance." That language seems peculiarly appropriate in considering this case, particularly in view of the fact that there is, in Louisiana, a special statute, Act No. 256 of 1912, which exempts fraternal insurance societies from the provisions of our special insurance laws. If it had been the intention of the Legislature to also exempt mutual benevolent associations, it would have been a very simple matter to include them along with fraternal societies in the act of 1912.

Quoting further from where we left off in Ruling Case Law, we see that:

"Where the whole purpose of an association is to secure to each member thereof the payment, on his death, to his beneficiary or representative, of a certain sum of money, subject to the fulfillment of the conditions imposed by the charter and by-laws, and practically the only qualifications required for membership are that the applicant shall be in a certain condition of health and within a certain age, then such society is an insurance company and bound to comply with the laws governing such."

There, it seems, we have exactly what this defendant association is, and, being so, it is then a society which is essentially in substance and form an insurance company, and is bound by the laws of this state governing such. Among those laws, of course, is Act No. 97 of 1908, which provides, as shown in the original opinion, that the company which does not require a medical examination of an applicant for insurance shall be presumed to have "waived its rights to claim a forfeiture of the policy based on the ground that the assured did not make true and full answers in the application as to the health, habits or occupation whenever it shall appear that the agent of the company knew, or might have ascertained with reasonable diligence, the true condition of the applicant's health, or the real facts as to his habits or occupation," and that "knowledge of the agent of the company in writing the application, or of the collector of the company in collecting the premiums from the assured, shall be imputed as notice to the company, as to the health, habits or occupation of the assured."

Having now reached the conclusion that the defendant is subject to the provisions of the act of 1908, we next have to consider the second question presented, which is: Does the waiver therein specified apply to statements made in an application for reinstatement as well as to those made in connection with the original application?

In view of a recent decision of the Supreme Court on a similar question before it, the matter is now an easy one for us to decide, as we have no alternative but to follow the decision of the Supreme Court.

We refer to the case of Eddins v. National Life & Acc. Ins. Co., 19 La. App. 472, 173 La. 644, 138 So. 430. That case involved the application of the provisions of Act No. 227 of 1916 to applications for reinstatement, and it was held that they applied the same as in the case of the original application. The act of 1916 is one of the same nature as that of 1908 under consideration here, and we believe the decision is controlling in this case. Indeed, counsel for defendant virtually concedes it to be, in the event we held that the act of 1908 governed at all.

The conclusions we have now reached force us to a different decision than was

originally rendered by us in which the judgment of the lower court was reversed and the demands of the plaintiff rejected.

For the above and foregoing reasons, it is now ordered, adjudged, and decreed that the original judgment of this court be, and the same is now, set aside, avoided, and reversed, and it is further ordered, adjudged, and decreed that the judgment of the district court be reinstated and made the judgment of this court. The defendant to pay all costs.

ELLIOTT, J. (dissenting). I think the Thibodaux Benevolent Association articles of agreement and their policy sued on are a kind of life insurance, and that, such being the case, the defendant is properly sued and cited as stated in the original opinion. I further believe that, if Act No. 97 of 1908 is applicable to the original policy, it applies with equal reason to the application for reinstatement; but I do not think the act in question applies to the agreement under which the Thibodaux Benevolent Association is operating and working. I think the act was intended to apply to life insurance companies which sell policies of insurance and receive payment in premiums, and where the policy issued is the direct obligation of the insurer to the insured or the parties claiming under him. But the defendant is not bound in that way, and does not operate in such a way, that its policies constitute an obligation such as is usually issued by regular life insurance companies.

I think the original opinion deals with the situation properly in the matter mentioned; consequently the act in question should not, in my opinion, enable the plaintiff to recover under the circumstances of the present case.

I therefore respectfully dissent.